REVISED - SEPTEMBER 27, 2000

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-10814

AMERICAN AIRLINES, INC.,

Plaintiff-Appellee,

V.

ALLIED PILOTS ASSOCIATION, RICHARD T. LAVOY,
and BRIAN A. MAYHEW,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Texas

September 21, 2000

Before WIENER, BENAVIDES and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Defendants-Appellants, Allied Pilots Association ("APA") and two of its officers, appeal an adjudication of civil contempt against them and an award of compensatory damages for that contempt. The district court awarded approximately $45.5 million dollars in compensatory damages after finding that defendants failed to carry out a temporary restraining order mandating that they call off a "sick out" by the pilot members of the APA. Defendants contest the evidence and the due process given in the district court's contempt and damage rulings and also argue that any award of compensatory damages is inconsistent with the

Railway Labor Act.

**FACTUAL HISTORY AND PROCEEDINGS BELOW**[1]

This saga began with American Airlines's ("American") acquisition of Reno Air, Inc. in December of 1998. Following the acquisition, American advised the APA that it intended to operate Reno Air separately for a transitional period due to legal, operational and business constraints that prevented instantaneous integration.[2] The APA, which is certified under the Railway Labor Act[3] to represent approximately 9,300 pilots employed by American, took the position that the newly-affiliated Reno Air flights should be flown in accordance with the existing Collective Bargaining Agreement ("CBA") between American and the APA. Specifically, the APA argued that American's operation of Reno Air with pilots not on American's Pilot Seniority List was in violation of the Recognition and Scope Clause of Section 1 of the CBA.[4] American refused to apply the CBA to the new

---

[1] The factual history of this case is thoroughly reported in the district court's July 23, 1999 Order. *See American Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 913-17 (N.D. Texas 1999).

[2] This proposed procedure was consistent with American's acquisition of Air Cal in 1987. Following that acquisition, American operated Air Cal as a separate carrier for a transitional period during which American and the APA successfully negotiated an agreement providing for the integration of the pilot workforces.

[3] 45 U.S.C. § 151-88 (1994).

[4] Section 1 of the CBA is titled "Recognition and Scope." Section 1(C), titled "Scope," states as follows: "(1) <u>General</u>.

-2-

affiliate.  The APA contended that American's operation of Reno Air outside the CBA constituted a unilateral amendment to the CBA which, under the RLA, justifies self-help measures such as a strike or other job action.  American took the position that the CBA did not immediately oblige it to apply its terms to Reno Air and that because the dispute with the APA involved contract interpretation,[5] it was a "minor" dispute under the RLA, thereby making unlawful any self-help action by the APA.

American and the APA negotiated for approximately two months without resolution.  On February 5, 1999, a large number of the APA's pilot members began an unannounced sick-out.  This illegal

---

All flying performed by or on behalf of the Company or an Affiliate shall be performed by pilots on the American Airlines Pilots Seniority List in accordance with the terms and conditions of the agreement."  This language is identical to that contained in the CBA in place during American's prior acquisition of Cal Air.

[5]  Despite American's willingness to do so, the APA failed to adhere to the CBA with regard to remedies for alleged violations of the Scope Clause in Section 1.  Section 1.L of the CBA, titled "REMEDIES" provides, verbatim:

    (1) The Company and the Association agree to arbitrate any grievance filed by the other party alleging a violation of this Section 1 on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator.  The arbitrator shall be a member of the National Academy of Arbitrators and experienced in airline industry disputes.  The burden of proof will be determined by the arbitrator.  The provisions of the Railway Labor Act shall apply to the resolution of any dispute regarding this Section 1.

job action[6] resulted in an enormous number of flight cancellations due to lack of crew, which, in turn, cost American millions of dollars in lost revenues and affected hundreds of thousands of passengers throughout the country.

The sick-out began on February 6, 1999. From that day until February 9, 1999, over 1600 flights were canceled because of lack of crew. On February 10, 1999, American sought relief from the district court in the form of a Temporary Restraining Order ("TRO"). At 4:00 p.m. (CST) on February 10 the district court signed the TRO. The TRO required the defendants and anyone working for or with them to take "all reasonable steps within their power" to prevent continuation or encouragement of the sick-out. The TRO also contained specific requirements: that the defendants "instruct all pilots to resume their normal working schedule," that the defendants notify all APA-represented pilots by the "most expeditious means possible" of the contents and meaning of the TRO, that the latter communication contain a directive "to cease and desist" the sick-out, that the communication be posted on the APA's web site, that the contents of the TRO ordering paragraphs be included on all telephone hotlines held by the APA, that the defendants report by noon on

_____

[6] The parties have stipulated that the dispute leading up to this job action was a minor dispute under the RLA. *See American Airlines*, 53 F. Supp. 2d at 917 ("Because it was a 'minor dispute,' Defendants were prohibited by the RLA from engaging in the sick-out as they did. The sick-out was thus an illegal job action.")

-4-

February 12, 1999, the methods used to effect the notice required by the TRO, and that copies of the notice and reports be furnished to American.

The district court found that the sick-out actually increased in size after the TRO was signed. On February 11, 1999, the day after the TRO was signed, over 1200 flights were canceled. That same day, American sought to hold the defendants in civil contempt for violating the TRO. After hearing evidence on American's contempt motion on February 12, 1999, the district court issued an Order of Contempt[7] in which the defendants were adjudged to be in civil contempt. In addition, a date was set for a hearing on the issue of compensatory damages for February 17, 1999.

At the February 17, 1999 hearing, American presented evidence regarding the amount of damages it suffered as a result of the defendants' contemptuous conduct. The defendants did not present evidence, but moved for a continuance which the district granted.

The hearing on damages reconvened on April 12, 1999, and was further continued until April 15, 1999. At the conclusion of the hearing, the district court announced its decision from the bench

---

[7] That unpublished order can be found at 1999 WL 66188 (N.D. Tex. Feb. 13, 1999). The district court also made findings of fact and conclusions of law at this hearing which can be found at 1999 WL 66168 (N.D. Tex. Feb. 13, 1999). Those findings and conclusions were adopted *in toto* in the district court's final opinion. *See American Airlines*, 53 F. Supp. 2d at 917 n.44.

to award $45,507,280.00 in compensatory damages attributable to the defendants' conduct.

**STANDARD OF REVIEW**

We review contempt findings and damage awards for contempt for abuse of discretion. *See Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 46 (5th Cir. 1992); *see also Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998) (noting that "review is not perfunctory" where "a district court's imposition of sanctions under its inherent power is involved"). The district court's underlying findings of fact are reviewed for clear error and its underlying conclusions of law reviewed *de novo*. *See Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985)).

**DISCUSSION**

**I.   Liability for Civil Contempt.**

   **A.   The District Court's Order.**

To support a contempt finding in the context of a TRO, the order must delineate "definite and specific" mandates that the defendants violated. *See* FED. R. CIV. P. 65; *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). "An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited." *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981). The district court need not

-6-

anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated. *See North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 917 (5th Cir. 1996) ("Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies the end results expected and allows the parties the flexibility to accomplish those results.").

The district court's TRO contained the following provisions:

> IT IS ORDERED, that the Defendants, and each of them, their agents, successors, deputies, servants and employees, and all persons acting by, in concert with, through or under them, or by and through their orders, are hereby temporarily restrained pending a hearing on the preliminary injunction in this matter:
>
> (a) From calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with American's airline operations, including but not limited to any strike, work stoppage, sick-out, slowdown or other concerted refusals to fly over a minor dispute or otherwise in violation of the RLA, 45 U.S.C., §§ 151-88 (1988).
>
> AND IT IS FURTHER ORDERED:
>
> (b) That the said Defendants and said other persons acting in concert with them shall take all reasonable steps within their power to prevent the aforesaid actions, and to refrain from continuing the aforesaid actions if commenced.
>
> (c) That the said Defendants shall instruct all pilots to resume their normal working schedule, and provide Plaintiff a copy of all such instructions.
>
> (d) That APA and the individually named

Defendants notify, by the most expeditious means possible, all APA-represented pilots employed by American of the issuance, contents and meaning of this Temporary Restraining Order, and produce a copy of all such messages to Plaintiff.

(e) That the notice described in (d) above include a directive from APA to those pilots who are engaging in a sick-out or other concerted refusals to fly to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same.

(f) That APA and the individually named Defendants post the notice described in (d) above to APA's Internet web site, and provide a copy of the notice to the Plaintiff.

(g) That APA and the individually named Defendants include the contents of the ordering paragraphs of this Order on all recorded telephone hotlines under control of Defendants or any of them, until such time as the Court has acted on Plaintiff's Motion for a Preliminary Injunction, and provide a copy of all messages to the Plaintiff.

(h) That APA and the individually named Defendants report by February 12, 1999, by sworn affidavit, the methods used to effect the notice described in (d) above to all APA-represented pilots.

(I) All copies required to be furnished to the Plaintiff by Defendants under this Order shall also be contemporaneously furnished to the Court.

Defendants argue that all of the specific requirements of the TRO were met. Our examination of this issue focuses on whether the general provisions of the TRO were sufficiently clear in what conduct they mandated and prohibited to support the contempt finding.

-8-

**B.    The Defendants' Efforts to Comply with the TRO.**

According to the defendants' brief, LaVoy appeared before television cameras immediately after the TRO was issued saying that the APA would comply with the district court's order and asking APA members to return to work.  The evening of February 10, LaVoy and Mayhew participated in a conference call with members of APA's Board of Directors.  On this conference call, Lavoy informed Mayhew and the Board of the TRO, told them that he would send out a message to members of the APA to begin compliance with the TRO as soon as possible, and told them that another conference call would be forthcoming to discuss such compliance after APA's counsel had an opportunity to review the TRO.  According to the defendants, LaVoy "unequivocally" told the Board that any pilot fit to fly ought to return to his schedule. That evening, at 7:30 p.m. (CST), LaVoy recorded a message on the APA's Information Hotline.[8]  That message read in pertinent part:

> It is important to bear in mind that this order does not constitute a judgment on the merits of the contractual dispute and should have no effect on either side's bargaining power.
>
> Also, please be aware that where the courts [*sic*] order refers to "defendants," it is referring to APA's National Officers, Board of Directors, Negotiating Committee and General Counsel.
> 
>                     * * *
> The Association will comply with the judge's order and

---

[8]  This message was also posted on the APA's web site.  *See* <http://www.alliedpilots.org/pub/hotline/19990210.html> (visited July 17, 2000).

plans to provide you, the membership, with more specific information about the order as soon as we have had an opportunity to complete our review.

As we have emphasized throughout this dispute, we remain focused on negotiating an agreement that is good for all of the pilots involved in the Reno Air acquisition. Today's legal maneuvering by management does not bring us any closer to our goal of a negotiated settlement.

Following a review by counsel the next morning, LaVoy recorded a revised Hotline message,[9] which repeated the previous day's statements regarding management's legal maneuvering and that the TRO was not a judgment on the merits of the contractual dispute and quoted the full text of the TRO. In addition, the February 11 (sent at 1 p.m. (CST)) message contained the following statement immediately after the full quote of the TRO:

That is the complete text of the order. Fellow pilots, the Allied Pilots Association and its officers do not authorize, ratify or condone any sick-out or slow down or violation of the prohibitions in the ORDER. We further instruct all pilots to resume their normal working schedule and to otherwise comply with Judge Kendall's February 10, 1999 order.

A similar statement, along with the text of the TRO, was distributed to all board and committee members with instructions to post the message on all domicile bulletin boards, to tell all pilots to resume their normal working schedules and to convey that the TRO prohibited a sick-out. In addition, a script for

---

[9] This message was also posted on the APA's web site. *See* <http://www.alliedpilots.org/pub/hotline/19990211.html> (visited July 17, 2000).

phone bank[10] volunteers was drafted.[11]  This script instructed the volunteer to read the following statement:

> The Allied Pilot's Association and its officers do not authorize, ratify, or condone any sick out or slow down or violation of the prohibitions contained in the ORDER.  We further instruct all pilots to resume their normal working schedule and to other wise comply with Judge Kendall's February 10, 1999 ORDER.

During the time between the issuance of the TRO (4 p.m., February 10, 1999) and late the following morning (February 11, 1999), the number of pilots on the sick list increased.  American moved for a finding of contempt and an award of compensatory damages against the defendants on the afternoon of February 11.  The district court issued an order requiring the defendants to show cause at a hearing at 10 a.m. on February 12, 1999, as to why they should not be held in contempt.  The district court also scheduled a hearing regarding American's prayer for compensatory damages for February 16, 1999.

At the contempt hearing the district court heard testimony from an American vice president and from several APA witnesses called by American.  Our review of the record shows that the questioning and discussion centered on the February 10, 1999, communications immediately following the issuance of the TRO.

---

[10]  The district court found that the Union ran a phone bank between February 7 and February 10 to call pilots and actively encourage them to call in sick.  *See American Airlines*, 53 F. Supp. 2d at 922.  This active process of notifying members was referred to in testimony as a "phone tree."  *See id.* at n.69.

[11]  Mayhew assisted in the drafting of this script.

According to the defendants' brief and our review of the record, the district court asked the APA's representatives why they did not initiate a "phone tree"[12] and why they did not order APA, members, specific terms, to clear the sick list immediately and return to work.

At approximately 4 p.m. (CST), following the February 12, 1999, contempt hearing, LaVoy placed yet another message (along with the text of the district court's order) on the APA's Hotline.[13]

> Before delivering the bulk of today's message, I want to make a personal plea to all of our pilots: the Association's leadership needs your help in complying with Judge Joe Kendall's Order. We need to get this airline back up and running at full capacity, and we

---

[12] Rather than set up the active "phone tree," the APA had set up a passive "phone watch" to notify members of the TRO's requirements. Testimony revealed that a "phone watch" is passive in the sense that the APA simply has people answering the phone when members call in for information. *See American Airlines*, 53 F. Supp. 2d at 922 n.68. The district court commented on this rather sudden switch in communication format:

> The evidence further demonstrates that although a phone bank (in the form of a "phone tree") was operational to cause the sick-out, at the time of the contempt hearing on February 12, 1999, one has not been established to call pilots to get them to stop. This is so even though from the operation of the "phone watch," they had both the lines and the manpower to take this very reasonable action to end this illegal sick-out and comply with this Court's Order.

*American Airlines*, 53 F. Supp. 2d at 922 (footnotes omitted).

[13] This message was also posted on the APA's web site. *See* <http://www.alliedpilots.org/pub/hotline/19990212.html> (visited July 17, 2000). This message was distributed to the 6,350 pilots for whom the APA had e-mail addresses.

need to do so quickly. Please clear the sick list immediately and resume your normal schedule. Again, APA is absolutely serious about doing all we can to comply with the judge's order, and APA's entire leadership is asking for your help in doing so.

* * *

That is the complete text of the order. Fellow pilots, I repeat, the Allied Pilots Association and its officers do not authorize, ratify or condone any sick-out or slow down or violation of the prohibitions in the order. Again, we further instruct our pilots to clear the sick list, resume your normal working schedule and to otherwise comply with Judge Kendall's February 10, 1999 order.

In addition, the APA started a "phone tree" and began actively calling pilots and telling them to clear the sick list and return to work.

## C.   Civil Contempt.

"A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (quoting *Petroleos*, 826 F.2d at 401). The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order. *See N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984).

## D.   Union and Individual Liability.

A union can be held in contempt "if the strike was conducted or encouraged by its members functioning as a union, by its agents acting within their apparent authority, or by those whose

-13-

acts the union can be held to have ratified by its inaction."
*Black Diamond Coal Mining Co. v. Local Union 8460*, 597 F.2d 494,
495 (5th Cir. 1979). "Ratification occurs where the union's
efforts to return strikers are so minimal that the union's
approval or encouragement may be inferred." *United States Steel
Corp.*, 598 F.2d at 365; *see also Black Diamond Mining*, 597 F.2d
495 ("[T]he circumstances surrounding the strike may create an
inference that the Union condones or ratifies the illegal
activity and the Union will be held responsible by its failure to
take measures to end the strike."). We find that the district
court did not abuse its discretion in concluding that the APA
ratified the illegal job action, and therefore, was in contempt
of the TRO.

The conduct of LaVoy and Mayhew failed to bring the APA into
compliance with the TRO.[14] They are therefore responsible for
the APA's disobedience of the TRO. As executive officers of the
APA, LaVoy and Mayhew are subject to contempt charges for their
failure to cause the APA to comply with the district court's
order. *See Wilson v. United States*, 221 U.S. 361, 376-77 (1911);
*see also N.L.R.B. v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st
Cir. 1984) ("[A]n officer, responsible for the corporation's

_____

[14] It is important for us to note that we are not setting
up an unreasonable standard for future labor litigants. LaVoy
and Mayhew are not being held responsible for their failure to
get the workers back to work, but for their *failure to use their
best efforts to effectuate the APA's compliance with the TRO.*

-14-

efforts and for its disobedience, may be held in contempt.").
The district court's conclusion that LaVoy and Mayhew are subject
to contempt charges for their acts (or omissions) in this illegal
job action was not in error.

**E.    The Defendants Violated the TRO.**

The district court found that the defendants' February 10,
1999, communication violated sections (a) thru (g) of the TRO.
*See American Airlines*, 53 F. Supp. 2d at 917-23.  The district
court's factual findings with regard to defendants' efforts to
comply with the TRO on February 10, 1999, are not clearly
erroneous.  The district court also found that the appellants'
February 11, 1999, communication violated sections (a), (b), (d),
(e) and (f) of the TRO.  The district court's factual findings
with regard to appellants' efforts to comply with the TRO on
February 11, 1999, are not clearly erroneous.  For the reasons
that follow, we find that the district court did not abuse its
discretion in finding the defendants in civil contempt for
violating the TRO.

**1.    The TRO's "all reasonable steps" requirement.**

Section (b) of the TRO clearly required the APA to "take all
reasonable steps" to end or prevent the sick-out.  Our review of
the district court's order and the record lead us to conclude
that is was not clearly erroneous for the district court to hold
that this portion of the TRO, *inter alia*, was not satisfied until

4 p.m. (CST) on February 12, 1999.  We agree with the district

court's finding that the February 10 communication did not purge

the defendants of contempt due to the fact that the communication

was

> so lacking in authoritative forcefulness that [it]
> either [was] not heard at all . . . or [was] discounted
> as being merely stage lines parroted for the benefit of
> some later judicial review.

*United States Steel v. United Mine Workers of America*, 598 F.2d

363, 366 (5th Cir. 1979), *quoted at American Airlines*, 53 F.

Supp. 2d at 921-22.

The district court's finding that the February 11

communication also failed to satisfy the "all reasonable steps"

portion of the TRO is also not clearly erroneous.  Like the

February 10 communication, the February 11 communication was a

minimalist, non-authoritative directive that was merely

accompanied by a verbatim quotation of the TRO.

The district court's conclusions that the February 10 and 11

communications did not constitute "all reasonable steps" by the

APA are bolstered by additional documents in the record prior to

the district court's issuance of the TRO on February 10, 1999.[15]

This evidence is a series of e-mails showing that APA

representatives forewarned pilot members that a federal

---

[15]  The printouts of the e-mails were attached to American's "Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Injunctive Relief," filed with the district court on February 9, 1999.

injunction may be forthcoming, but that the pilots should not feel compelled to return to work immediately. The final transmission, dated February 5, 1999, was written by Los Angeles APA Chairman Denny Breslin and contained the following statements:

> This is the time of the year when colds, flu and viruses abound. In addition to the normal health concerns, the stress and distraction due to our current contract dispute appears to be taking its toll. As an organization dedicated to safety, we cannot tolerate any degradation of safety within our cockpits.
> * * *
> Captains, please make every effort to ensure that your crew is not emotionally distracted in any way. Please don't engage in discussion in the cockpit that could cause a safety hazard. If you decide that you are unfit to fly your next trip, and MOST pilots probably are, then you should contact crew schedule immediately to let them know you are SICK. You are not required to state the nature of your illness, and do not allow yourself to be dragged into a discussion about it.
> * * *
> Our intention is to vigorously defend any pilots' [*sic*] right to use their sick leave appropriately.
> It is possible that a Federal Judge will enjoin the APA from an alleged illegal job action. If that happens it does NOT mean that you, as an individual, may return to work if you still feel too stressed to perform safely in the cockpit. Remember the FAA has given YOU the final determination whether or not you are fit for flying duty.

This evidence, in front of the district court *prior to its issuance of the TRO*, strongly supports the district court's finding that the communications of February 10 and 11 did not constitute "all reasonable steps" to prevent or otherwise stop the sick-out. Indeed, it strongly implies that the intention of

the APA and its leaders[16] from the outset was to instigate the very illegal job action that took place.

### 2. The TRO's "cease and desist" requirement.

Section (e) of the TRO required the APA to issue "cease and desist" directives to pilots engaging in the sick-out. A plain reading of the February 10 and 11 communications shows that neither communication contained a direction to stop the sick-out. The February 11 addition to the communication that the "pilots resume their normal working schedules" is "so lacking in authoritative forcefulness" that it did little if anything to halt the sick-out. As stated above, the number of APA pilots on the sick list actually increased in size on February 11.

### 3. Defendants did not Purge Themselves of Contempt Until February 12.

We find that the district court's conclusion that defendants failed to purge themselves of contempt via the February 10 and 11 communications was not clearly erroneous. Significant evidence from our review of the record shows that it was not until February 12, 1999, at 8 p.m. (CST), that LaVoy finally took action, on behalf of the APA, sufficient to purge the defendants

---

[16] Although there was originally some question as to whether the Union formally organized the sick-out, counsel for defendants later admitted that they had a hand in organizing the illegal work action. *See American Airlines*, 53 F. Supp. 2d at 922 n.71 (describing as "troubling" this "complete 180 degree turn from what had earlier been stated to the Court on the record in open court by LaVoy and defendants' counsel").

of contempt.

**F.    Due Process and the District Court's
       Contempt Proceedings.**

Defendants argue that they were entitled to more process than they received during the contempt phase of this proceeding. As primary authority for this assertion, the defendants assert that the standard applied in *International Union, UMWA v. Bagwell*, 512 U.S. 821 (1994), should apply in the situation *sub judice*. We decline the invitation to apply the principle enunciated in *Bagwell* to civil contempt situations.

Contempt proceedings are naturally "summary in form and swift in execution." *Ryals v. United States*, 69 F.2d 946, 947 (5th Cir. 1934). The defendants' argument that they are entitled to what amounts to a full trial on the merits of their contempt charge is contrary to case law. *See, e.g.*, *Placid Refining Co. v. Terrebonne Fuel & Lube*, 108 F.3d 609, 613-14 (5th Cir. 1997) (holding that civil contempt proceeding that gave "notice and an opportunity to be heard" was constitutional), *accord Alberti v. Klevenhagen*, 46 F.3d 1347, 1359 (5th Cir. 1995).

The defendants had adequate notice of the contemptuous acts or omissions alleged by American. American's Motion for Contempt asked the district court to hold the defendants in contempt because (1) the sick list increased in number after the issuance of the TRO; (2) the messages on the Hotline and the Internet were

-19-

not in compliance with the TRO's mandates; and (3) the defendants did not take "all reasonable steps within their power to" prevent continuation of the sick-out.

We find that the allegations in American's Motion for Contempt provided the defendants adequate notice to inform them of the nature of the charges and to enable them to prepare a defense. "Simple notice is all that is required." *United States v. Powers*, 629 F.2d 619, 625 (9th Cir. 1980). Couple this with the district court's Show Cause Order[17] and the record shows that defendants were provided with all the notice necessary under the Due Process Clause.

Defendants also argue that the district court's decision to allow American to expand the record after the February 12 hearing without giving defendants an opportunity to confront this new evidence violated their right to due process. As noted in our discussion of the defendants' violations of the TRO, the February 10 and 11 communications along with the series of e-mails forewarning the pilot members of impending court action (all of which were in front of the district court prior to its issuance of the TRO) provide sufficient evidence that the defendants'

---

[17] The district court's "Order to Show Cause" advised the defendants to appear on February 12 and "show cause, if any there be, why they should not be adjudged in civil contempt of this Court, and why the Court should not impose fines on Defendant APA and individual named Defendants, as prayed in the Motion of Plaintiff."

actions did not comply with the spirit or letter of the TRO. Therefore, any discussion of the post-February 12 evidence is unnecessary and moot.

## II. "Compensatory Damages" for Civil Contempt.

### A. "Compensatory Damages" Under the RLA vs. "Compensatory Damages" for Violation of a Court Order.

In this circuit, American may not recover from the APA or its representatives under the RLA for damages caused by illegal strikes due to "minor disputes." *See Burlington Northern Rail. Co. v. Brotherhood of Maintenance of Way Employees*, 961 F.2d 86, 88 (5th Cir. 1992) (Wisdom, J.); *Louisville & Nashville Rail. Co. v. Brown*, 252 F.2d 149, 154-55 (5th Cir. 1958). The analysis in *Brown* focused on the fact that Congress did not specifically note in the RLA that damage remedies were available. *See* 252 F.2d at 155. Importantly, this analysis did not hold that district courts were stripped of their contempt remedies by the RLA.

There is a difference between a damage action by an employer for harm resulting from an illegal strike and a compensatory sanction issued by a court for disobedience of its mandates.[18] With the compensatory sanction, the end result is largely the same as an action for damages--the employer is compensated. *See,*

---

[18] This point was also not lost on the district court. *See, e.g.*, *American Airlines*, 53 F. Supp. 2d at 941 n.182 ("The money is not being ordered paid because of the illegal work stoppage, but for the damages caused by not ending it when ordered to do so by a federal court.").

-21-

*e.g.*, *Chandler v. James*, 180 F.3d 1254, 1270 (11th Cir. 1999) ("Compensatory sanctions merely imitate the relief that would be provided in a damages action."). However, the justification for the sanction is different than that for the damage action. The district court recognized this distinction in its articulation of the controversy in this case:

> The basic controversy in this case is whether the APA was engaged in an illegal job action under the RLA and whether they should be ordered to stop via a TRO and Injunction after a hearing. The basic controversy was resolved in favor of American when the Court found and the APA stipulated that this was a "minor dispute" under the RLA, thus making the APA instigated sick-out an illegal job action under the RLA. Furthermore, the parties have now asked the Court to enter an agreed injunction. If the TRO had been obeyed, the APA would not owe a dime because damages are not available under the RLA. But the Defendants are liable for damages because of their contemptuous acts of not obeying and ending the illegal sick-out when ordered.

*American Airlines*, 53 F. Supp. 2d at 939-40. In short, the sanction was issued in this case to compensate American for the damages caused by the *defendants' violation of the TRO*, not a violation of the RLA.

"Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947); *see also Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976) ("Compensatory civil contempt reimburses the

-22-

injured party for the losses and expenses incurred because of his adversary's noncompliance."), *accord Travelhost*, 68 F.3d at 961-61; *Petroleos*, 826 F.2d at 400. Because the contempt sanction in this case was ordered to compensate American for lost revenue resulting from the defendants' contemptuous conduct, it is clearly compensatory in nature.[19]

The district court "has broad discretion in the assessment of damages in a civil contempt proceeding." *Long Island Rail. Co. v. Brotherhood of Rail. Trainmen*, 298 F. Supp. 1347, 1347 (E.D.N.Y. 1969). "The purpose is to compensate for the damages sustained. The public rights that the said court orders sought to protect are important measures of the remedy." *Id.* (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). In this case the sanction issued by the district court sought to protect the sanctity of judicial decrees and the legal process. *See McComb*, 336 U.S. at 193 ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."). "In our complex society, there is a great variety of limited loyalties, but the overriding loyalty of all is to our country and to the institutions under which a

---

[19] In its April 12, 1999, hearing on compensatory damages, the district court was emphatic in using the civil contempt terminology and in proclaiming that any damages paid by the APA were going directly to American. "While the district court's characterization is certainly not controlling, it can be considered." *Petroleos*, 826 F.2d at 399 n.11 (citations omitted).

particular interest may be pursued." *United Mine Workers*, 330 U.S. at 306. The district court did not abuse its discretion in deciding to award American compensatory damages for the injuries caused by the defendants' civil contempt.

**B.    Due Process and "Compensatory Damage" Proceedings.**

Our review of the record in this case demonstrates that the issue of damages is indeed a complex one. Given the fact that the damages are not susceptible to simple quantification, we must ensure that careful procedures were used to ascertain the amount appropriate to compensate American and to vindicate the district court's authority to demand adherence to its orders. We find that the district court did not abuse its discretion during the damage phase of its contempt proceeding as it addressed the issue with adequate procedural vigilance.[20]

At the February 17, 1999, hearing, American presented its case-in-chief which relied heavily on expert testimony. The defendants were allowed to cross examine the experts, but were not given advance notice of the experts' reports or allowed to depose the experts. When American was finished presenting its case, the defendants requested a continuance to develop their defense. The district court granted the defendants' request and

---

[20]    Consistent with our due process analysis with respect to the liability phase of the civil contempt proceeding, we decline to adopt a procedural requirement in civil contempt sanction hearings akin to that set forth in *Bagwell.*

continued the damages phase of its contempt hearing until mid-April.  At this subsequent hearing, defendants were again allowed to cross examine the plaintiff's experts and were allowed to present their other evidence.  The extension of time allowed the defendants more than adequate time to develop their arguments regarding the damages caused by their conduct.

The defendants' brief discusses at length only one specific example of how the district court purportedly violated their due process rights in the damages hearing: the so-called "truncated discovery process."  The manner in which the district court tailored the discovery to the particular demands of the damages phase of this case was well within its discretion in this particular case.  *See, e.g.*, *Munoz v. Orr*, 200 F.3d 291, 305 (5th Cir. 2000).  In our view, defendants have not demonstrated how additional discovery would shed any significant amount of light on the issue.

Our review of the record reveals no evidence of inadequate due process during the damage phase of this trial.  The procedural framework set up by the district court was sufficient for all parties to develop their respective damage cases.  Both sides presented complex damage models that involved expert testimony and industry document analysis.  Based on the testimony of American's damage experts, *inter alia*, the district court determined that American's overall loss caused by the work

stoppage were somewhere between $200 to $250 million.[21]  The basis of the district court's compensatory damage award was the actual damages suffered during the two days the APA was in contempt.  This amount, approximately $51 million, was reduced another 11 percent for the margin of error in American's revenue estimation and "booking away" that may have occurred.[22]  Any additional time and proceedings would serve to prolong this unfortunate incident and would not benefit anyone.

The district court's decision to continue the damages hearing and tailor the discovery process in the manner it chose was not an abuse of discretion.

## CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's ruling on the defendants' liability for civil contempt. We also AFFIRM the district court's determination of damages for

---

[21]  The district court ultimately found the testimony of APA's damage model experts contradictory, *see American Airlines*, 53 F. Supp. 2d at 935 (finding that the two APA experts differed with each other on the harm suffered by American by a factor of six and differed on the amount of damages for the two days by a factor of two), and unreliable. *See id.* (finding the assumptions that formed the basis for their calculations were "inconsistent with the obligations imposed on Contemnors by the TRO and the reality of the pilots' actions as evidenced by their conduct once they were directed to return to work on February 12").  These findings by the district court are not clearly erroneous.

[22]  Booking away is a phenomenon that occurs when passengers become aware of the fact that there is some sort of job action going on at American, then those whose tickets permit them the flexibility to change their reservations, change them to another airline because of potential disruption of service at American.

that civil contempt.

AFFIRMED.