**In the Matter of Barry RENO.**

**No. 02–303.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 23, 2003.

Marvin Isgur, Floyd, Isgur, Rios and Wahrlich, P.C., Houston, TX, for Byron Sims.

Barry Reno, Dallas, TX, pro se.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

On August 20, 2003, Byron Sims filed a motion to hold Barry Reno in civil contempt for violating the court's order entered September 20, 2002. Sims seeks compensatory damages to remedy the civil contempt. The court conducted an evidentiary hearing on the motion on September 3, 2003.

Bankruptcy Rule 9014 governs a motion for civil contempt. Bankruptcy Rule 9020. The United States Trustee suggested that the court should apply the adversary proceeding rules. Reno did not adopt that request until after the presentation of evidence. Reno did request a continuance of the hearing. Finding that Reno failed to show cause for a continuance, the court denied the motion. The court declined to apply the adversary proceeding rules.

 The movant in a civil contempt proceeding must establish "'by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order.'" *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir.2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). The movant need not show that the conduct was willful so long as the "contemnor actually failed to comply with the court's order." *Id.* at 581.

By order entered July 24, 2002, this court suspended Reno from the practice of law before this court until further court order. Following hearings on August 26, 2002, and September 4, 2002, the court entered an order on September 20, 2002, providing:

that, effective September 24, 2002, the suspension of Barry Reno from the practice of law before this court shall terminate, subject to the following terms of probation:

Barry Reno shall maintain and properly use an IOLTA trust account. Barry Reno shall timely comply with all State Bar of Texas licensing requirements. Barry Reno shall retain Garner & Cooper, LLP, to perform the services discussed in the above memorandum opinion. Barry Reno shall further maintain a law office staff consisting of, at least, an office manager, a clerical assistant and a paralegal. Barry Reno shall complete his law office flow chart for case procedures through case closing, with instruction and training for his law office staff, to assure attention to client detail. Barry Reno shall continue to obtain professional assistance for personal matters and shall endeavor to participate in an appropriate State Bar of Texas mentoring program.

September 20, 2003, order, p. 15.

After the entry of the order, Reno represented clients in cases before this court. Sims was one of those clients. But Reno failed to comply with the court's order. Reno did not retain Garner & Cooper, LLP, to perform the designated services. Reno did not maintain the office staff required by the court. Reno did not continue his psychotherapy. Reno testified that he could not afford to comply with the court's order. Reno ignored that the court imposed the requirements based on Reno's suggestions at the hearings of August 26, 2002, and September 4, 2002, to remedy

the deficiencies in his practice of law. Those deficiencies included a failure to attend to the details of his clients' cases. Reno never moved the court for relief from the requirements of the September 20, 2002, order. Instead, he ignored them.

On December 13, 2002, Sims filed a petition for relief under Chapter 13 of the Bankruptcy Code, case. no. 02–81001–BJH–13. Reno was his attorney of record. At the hearing on September 3, 2003, counsel for Sims asked Reno if Reno complied with Bankruptcy Rule 9011 before filing the petition. Reno initially testified that he did not know Rule 9011. Counsel provided Reno with a copy of the rule. Reno then testified that he met his obligations under the rule before filing the case. Reno and Sims agreed that Reno would receive compensation of $2,000. Sims paid $681 up front; the remainder would be paid through a Chapter 13 plan.

Sims missed his first Chapter 13 plan payment. The Standing Chapter 13 trustee sent a notice to Sims and Reno that the case would be dismissed under General Order 98–4 unless Sims made the payment within 48 hours. Sims testified that he did not recall receiving the notice. Reno did not call Sims to discuss the notice. Reno did not communicate with Sims regarding the notice.

On February 7, 2003, the court entered an order dismissing the case for failure to make the first plan payment. Reno received a copy of the order. Reno did not personally call Sims to inform him of the order. Reno did not personally communicate with Sims concerning the order. Reno testified that he told his secretary to call Sims about the order. Reno did not hear his secretary call Sims. Reno did not present any evidence establishing that his law office informed Sims of the entry of the dismissal order or discussed the order with Sims.

Sims meanwhile took his payment to the trustee's office, where he learned that the case had been dismissed. Sims called Reno for an appointment. On March 7, 2003, Wells Fargo Home Mortgage, Inc., issued a notice to Sims that it would foreclose on his house on April 1, 2003. Sims testified that he met with Reno in March 2003 because of the foreclosure notice. Reno testified that Sims did not discuss the foreclosure notice with Reno nor show the notice to Reno. Sims' friend, Bradley Levine, accompanied Sims to Reno's office. Sims and Levine discussed the foreclosure notice. Levine emphasized to Sims the need to discuss the foreclosure notice with Reno.

Reno knew that Sims filed the 2002 case because of mortgage arrearages and that Sims wanted to try to protect his house. Reno knew that the case had been dismissed. Sims discussed with Reno what actions he could take to protect his home following the dismissal of the 2002 case. Reno's testimony that Sims did not discuss the foreclosure notice when they met in March 2003 is not credible.

Reno and Sims scheduled another meeting for March 17, 2003. At that meeting, Sims delivered funds to Reno to cover the filing fee for another Chapter 13 case. Sims expected Reno to file the case before the scheduled April 1, 2003, foreclosure. Sims returned to Reno's office on March 24, 2003, to sign his bankruptcy schedules for the new case.

Reno did not file a new case before April 1, 2003. Reno testified that he was concerned that Sims could not afford the plan payments so Reno deferred filing the case. Wells Fargo conducted a foreclosure sale on April 1, 2003. Reno filed case no. 03–35097–SAF–7 for Sims on May 19, 2003. The case was converted from chapter 7 to chapter 13 on June 13, 2003. Sims learned

that Reno had not filed a bankruptcy case prior to the foreclosure sale when Sims received an eviction notice in April 2003. At about the same time, Sims learned of the court's September 20, 2002, order.

Sims concedes that he did not make mortgage payments during the 2002 case and that he had income problems. He would have had a difficult time presenting a feasible Chapter 13 plan in a new 2003 case. But Reno testified that Sims had a reasonable basis to file the 2002 case under Rule 9011. As Sims' situation had improved slightly, Sims questions why Reno would not have filed the 2003 case before the foreclosure date.

Sims has made an election of remedies. He acknowledges that he will not bring a legal malpractice lawsuit against Reno or seek sanctions from the State Bar of Texas. Rather, Sims contends that Reno's handling of his case demonstrates the very problem the court's September 20, 2002, order had been designed to cure; namely, by violating that order, Reno did not cure the problem, thereby harming Sims. Violating the order amounts to civil contempt of court. Sims requests that Reno purge the contempt by compensating him for his losses.

The court has previously found that Reno's inability to manage his law practice resulted in his failure to attend to the details of his clients' cases. Inattention to details in a bankruptcy case often results in adverse consequences for the debtor. Reno's inability to manage his law practice occurred in the context of repeated failures to maintain his license in Texas and in the misuse of his clients' money. The requirements of the court's order were imposed to correct these problems, thereby protecting the public while allowing Reno the opportunity to pursue his livelihood.

Reno failed to comply with the court's order. Yet Reno did not seek relief from the court's order. Reno's noncompliance with the court order resulted in the very management problems in the Sims case that the order had been designed to eliminate.

Reno did not attend to Sims' needs. Reno did not address with Sims the trustee's notice of deficiency. Reno did not inform or consult with Sims concerning the dismissal order. Reno blamed his secretary for his failure to communicate with Sims. Reno's testimony that he did not know about the foreclosure notice is not credible. If Reno believed that Sims could not afford a new Chapter 13 case, he had a professional obligation to counsel Sims prior to the foreclosure date. If Reno believed, on the other hand, that Sims had a reasonable basis to file another case, Reno should have filed the 2003 case before the foreclosure date. The court infers that Reno knew about the foreclosure notice and failed to act timely through oversight and office mismanagement. The likelihood of these deficiencies occurring would have been substantially reduced had Reno complied with the court's order.

The court finds Reno in contempt of the September 20, 2002, order.

Reno may purge the contempt by compensating Sims.

■■■ " 'Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.' " *American Airlines*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). A court has broad discretion when assessing damages for civil contempt. *Id.* " 'The purpose is to compensate for the damages sustained. The public rights that the said

court orders sought to protect are important measures of the remedy.'" *Id.* (quoting *Long Island Rail. Co. v. Brotherhood of Rail. Trainmen,* 298 F.Supp. 1347, 1350 (E.D.N.Y.1969)). Compensation for damages sustained includes actual pecuniary losses. *American Airlines,* 228 F.3d at 586. Compensation for damages sustained may include damages for emotional distress. *See Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir.1998) (applying a statutory definition); *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 813, 819 (Tex.App.-Corpus Christi 1988) (awarding mental anguish damages under common law tort).

■ Sims requested $35,000–40,000 as compensation. Sims lost his house through foreclosure. But Sims had a poor mortgage payment history, which he cannot blame on Reno. Sims would have struggled to successfully complete a Chapter 13 plan under either the 2002 or 2003 case. Thus, Sims may have lost his house even if Reno adequately performed by consulting with Sims prior to or in time to cure the dismissal of the 2002 case or by timely filing the 2003 case.

Sims also testified that he did not base his damage request on an appraisal of his house, although he testified that he believed he had about $15,000 in equity, which he lost.

Had Reno complied with the court's order, he would have had an office management system that would have alerted him to the deficiency notice and the dismissal order. He would have then been in a position to consult with Sims. Sims testified that he had the 2002 plan payment. Compliance with the court's order would have likely meant, in the Sims case, that the payment would have been made in time to salvage the 2002 case. The foreclosure notice would not have been issued in March 2003. Sims would have had a fighting chance to fund his 2002 case.

Similarly, had Reno complied with the court's order, he would have had an office management system that would have calendared the April 1, 2003, foreclosure date. Reno would have been able to timely file a new case or consult with Sims before the filing of the case if Reno questioned the good faith basis for another filing. The office management system would have registered the filing fee that Sims had tendered in March 2003. Again, this would have resulted in the delay of the foreclosure.

Sims testified that his house had a tax appraisal value of $85,000. He scheduled the value of the house in his 2002 case at $83,000. Wells Fargo filed a proof of claim for $81,610.40, and valued the property at the amount of the debt. Considering closing costs, Sims had no equity in the property.

Thus, at best, Sims should have had a continuing chance to fund a Chapter 13 plan. As he had funds to make the 2002 plan payment when his case was dismissed, he should have been able to delay the foreclosure. The record reflects, however, the difficulty Sims would incur funding the plan while making his monthly mortgage payments. If he failed to ultimately fund the plan to completion, he would have lost the property anyway, and he had no equity in the property to protect or realize. An unsuccessful plan would be tantamount to paying rent.

By not having the chance to continue with a plan, however, Sims must incur present moving expenses. Since the April 1, 2003, foreclosure should have been delayed and Sims should have had an opportunity to make plan payments, Sims should not have presently incurred moving expenses. To purge the contempt, Reno

must compensate Sims for these expenses. The court sets the expenses at $2,000.00.

Sims received no benefit for the $681 paid to Reno for the 2002 case. That payment must be returned.

In addition, Sims had to attend court hearings to enforce the court's order. The court finds that Sims should recover $1,000.00 to compensate him for that time, which he should not have had to incur.

Sims also retained the services of counsel to enforce the court's order. To purge the contempt, Reno must compensate Sims for his counsel's fees. Sims' attorney shall, within 10 days of the date of entry of this memorandum opinion and order, file an affidavit stating his fees and out-of-pocket expenses.

■ To purge the contempt, Reno also must compensate Sims for his emotional distress. Compensatory damages for mental anguish may be awarded where the complainant "suffers sleeplessness, anxiety, stress, marital problems, and humiliation, and does not always require that the plaintiff offer medical evidence or corroborating testimony in addition to her own testimony." *Migis,* 135 F.3d at 1047.

Sims testified that he suffered depression following the foreclosure. He testified that he suffered sleep loss and the distress of a pending eviction. Levine corroborated Sims' testimony by testifying that the foreclosure notice left Sims distraught and depressed. Levine testified that after Sims learned of the foreclosure, Sims cried and experienced headaches, chest pains and inability to sleep. Levine stated that Sims' depression appeared to last a couple of days.

The foreclosure should have at least been delayed. Sims should have had the opportunity to find a financial solution to the mortgage problem or prepare for an inevitable foreclosure. Reno should have

protected him in both the 2002 and 2003 cases. But, as significant, if Reno had been attending to the details of Sims' case and if Reno actually questioned the appropriateness of a 2003 filing, Reno should have consulted with Sims in March 2003 to prepare Sims for the loss of his home. By not attending to the details of Sims' case at the time of the dismissal of the 2002 case, and after their March 2003 meetings, Reno's contempt caused the immediate distress.

As Sims' distress was of a short duration, and considering Sims' precarious financial situation concerning mortgage payments, Sims' mental and emotional distress damages are limited to $5,000.

In *Migis,* the Fifth Circuit held that the district court did not abuse its discretion in awarding the plaintiff, Melissa Migis, $5,000 in compensatory damages for mental anguish stemming from her claim of pregnancy discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.* Migis' employer had terminated Migis due to her pregnancy. The evidence of Migis' mental anguish, resulting in the award of $5,000 in mental anguish damages, consisted solely of Migis's testimony that her termination was a major inconvenience, that she suffered from low self-esteem, serious financial hardships in relation to her new baby, stress, anxiety attacks, marital hardship, sleeplessness and crying because of her termination. *Migis,* 135 F.3d at 1046. *See also Oden v. Oktibbeha County, Miss.,* 246 F.3d 458, 470–71 (5th Cir.2001) (plaintiff's own testimony that as result of defendants' discrimination he experienced stress, sleeplessness, betrayal, and shame was sufficient to uphold jury award of $20,000 in compensatory damages for mental anguish).

In this case, as in *Migis,* the complainant, Sims, testified to his own emotional

distress. But here, unlike in *Migis,* there was additional testimony, from Levine, corroborating Sims' testimony. Furthermore, the courts in *Migis* and in *Oden* upheld awards of $5,000 and $20,000, respectively, for the same kind of distress experienced by Sims—stress, anxiety, sleeplessness, and crying.

Based on this analysis, the court concludes that, to purge the contempt, Reno must pay Sims a total of $8,681.00 plus his attorney's fees and out-of-pocket expenses.

### Order

Based on the foregoing,

**IT IS ORDERED** that Barry Reno is found in civil contempt of court.

**IT IS FURTHER ORDERED** that Barry Reno shall purge the con-tempt by paying Byron Sims $8,681.00 plus his attorney's fees and out-of-pocket expenses. The purge amount shall bear interest until paid at the federal judgment rate. Reno's license to practice law before this court has been suspended until January 3, 2005. Unless otherwise ordered by the court, even after Reno's suspension expires, Reno may not resume practicing law before this court until he purges this contempt.

Counsel for Sims shall prepare a final order consistent with this order. Counsel shall include in the draft of the final order the amount of attorney's fees and out-of-pocket expenses.