# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 27, 2012

No. 11-30936

Lyle W. Cayce
Clerk

HORNBECK OFFSHORE SERVICES, L.L.C.; BEE MAR - WORKER BEE,
L.L.C.; NORTH AMERICAN FABRICATORS, L.L.C.; BEE MAR, L.L.C.;
OFFSHORE SUPPORT SERVICES, L.L.C.; ET AL,

Plaintiffs-Appellees

v.

KENNETH SALAZAR, SECRETARY, DEPARTMENT OF INTERIOR, also
known as Ken Salazar; UNITED STATES DEPARTMENT OF INTERIOR;
BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT;
MICHAEL R. BROMWICH, In His Official Capacity as Director, Bureau of
Safety and Environmental Enforcement,

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before WIENER, ELROD and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This case arises from the 2010 Deepwater Horizon accident in the Gulf of
Mexico. An explosion killed 11 workers, caused the drilling platform to sink, and
resulted in a major uncontrolled release of oil. At Presidential direction, those
events prompted the Department of the Interior to prohibit all new and existing
oil and gas drilling operations on the Outer Continental Shelf for six months.
The district court preliminarily enjoined enforcement of the moratorium. The

No. 11-30936

single issue on appeal is whether Interior's subsequent actions violated a specific provision of the court's injunction, justifying a finding of civil contempt. The district court was certainly correct that Interior immediately took steps to avoid the effect of the injunction, but we conclude none of those actions violated the court's order. We REVERSE.

FACTUAL AND PROCEDURAL HISTORY

The Deepwater Horizon tragedy occurred on April 20, 2010, as the Transocean drilling crew was preparing to temporarily abandon BP's discovery-well prospect 52 miles from shore in almost 5,000 feet of water in the Gulf of Mexico. The explosion and fire caused the platform to sink two days later. For almost three months, oil gushed from the wellbore in the sea floor.

On April 30, the President ordered Secretary of the Interior Ken Salazar to review the event and, within 30 days, to report on "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf." That same day, with Order No. 3298, the Secretary established an Outer Continental Shelf Oversight Board.

About a week later, the Secretary announced that "as a result of the Deepwater Horizon explosion and spill, beginning April 20 – the date of the explosion – no applications for drilling permits [would] go forward for any new offshore drilling activity" until his report to the President. That report – Increased Safety Measures for Energy Development on the Outer Continental Shelf – was released on May 27. In addition to a variety of recommendations calling for new studies, regulations, and inspections, the Safety Report recommended (1) "a six-month moratorium on permits for new wells being drilled using floating rigs" and (2) "an immediate halt to drilling operations on the 33 permitted wells that [were] currently being drilled using floating rigs in

the Gulf of Mexico." This six-month moratorium appeared in the Executive Summary but not in the body of the Safety Report.

The Safety Report represented that its recommendations had "been peer-reviewed by seven experts identified by the National Academy of Engineering." It would later come to light that five of those experts never reviewed or agreed to the blanket six-month moratorium. Although no wrongdoing was attributed to Interior, an Office of Inspector General report cited by the district court found that after expert review, White House officials had inappropriately modified it.

On the day after the Safety Report's release, May 28, 2010, the Secretary issued what the parties refer to as the "May Directive." The May Directive explained that based on the

> report to the President, and further evaluation of the issue, [the Secretary] find[s] at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment as that is specified in 30 C.F.R. 250.172(b).
> . . .
>
> [The Secretary also] direct[ed] a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions. . . . For those operators who are currently drilling new deepwater wells, they shall halt drilling activity . . . . [and] the [Mineral Management Service ("MMS")] shall not process any new applications for permits to drill consistent with this directive.

Interior executed this directive by issuing a general Notice to Lessees and Operators of Federal Oil and Gas Leases ("NTL No. 2010-N04" or "Notice to Lessees"), effective May 30, which explained that MMS would not consider any new applications for six months in "deepwater," defined as depths greater than 500 feet. There were roughly 4,500 active leases in the Gulf's deepwater at the time. MMS also transmitted individual letters to the 33 operators of permitted wells that were being drilled at the time, providing notification that their

activities were temporarily suspended "consistent with the Secretarial Directive and Notice to Lessees."

Hornbeck Offshore owns and operates a fleet of vessels that support deepwater exploration. It had contracts with nearly all of the operators of the 33 permitted wells ordered closed. Along with close to forty other companies involved in oil and gas drilling, exploration, and production, Hornbeck filed suit on June 7 seeking declaratory and injunctive relief. The complaint alleged that the May Directive and the Notice to Lessees were inadequately explained and justified, in violation of the Administrative Procedures Act ("APA"), and that in issuing the Directive and the Notice the Secretary exceeded his authority under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1332.

Finding only the APA, not the citizen-suit provision of the OCSLA, pertinent, on June 22 the district court granted Hornbeck the preliminary injunction at the center of this case. That injunction ordered that Interior, MMS, and

> their servants, agents, successor agencies and employees, and all persons in active concert of participation with them, who receive actual Notice of this Preliminary injunction [were] immediately prohibited from enforcing the Moratorium, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells" dated May 28, 2010, and NTL No. 2010-N04 seeking implementation of the Moratorium, as applied to all drilling on the OCS in water at depths greater than 500 feet.

The Secretary issued a press release responding to the injunction that day, stating that "[t]he decision to impose a moratorium on deepwater drilling was and is the right decision" and that the government would appeal the ruling to the Fifth Circuit. He concluded the release by announcing that on the basis of "ever-growing evidence, I will issue a new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."

No. 11-30936

Simultaneously, Interior took some steps to comply with the injunction. Interior again sent individually addressed letters to the operators of the 33 wells at which it had ordered a halt to production, explaining that neither the Notice to Lessees "nor the order directing a suspension of operations [the May Directive] has legal effect on your operations at this time." In contrast to its actions in imposing the moratorium, though, Interior did not notify the industry-at-large, namely the operators and lease holders not currently drilling.

A letter bearing the subject line "Immediate Prohibition from Enforcing the Moratorium on Drilling New Deepwater Wells" went to all Interior employees on June 23. It excerpted the district court's order and explained that employees were "not to take any action to enforce the Moratorium issued on May 28, 2010, or to enforce NTL No. 2010-N04" until the Secretary gave additional orders.

Also on June 23, the Secretary appeared before the United States Senate Subcommittee on Interior, Environment, and Related Agencies. Though his scheduled topic was bureaucratic reorganizations affecting MMS, the Secretary made several comments about the moratorium that bear on this litigation.

Interior immediately appealed the injunction order to this court. It also filed a motion for a stay of the injunction. Interior noted in its filing that it intended to issue a new, similar moratorium. A divided panel of our court denied the stay request, without prejudice to the Secretary's "right to apply for emergency relief if he [could] show that drilling activity by deepwater rigs has commenced or [was] about to commence." Four days after that ruling, on July 12, 2010, Interior rescinded the May Directive. A "July Directive" was substituted. Without doubt, the new suspension directive was the same "in scope and substance." The difference was that it contained a more thorough explanation of reasons and referred to more voluminous evidentiary support. Interior returned to this court that day, arguing that we should vacate the

5

district court's June 22 injunction of the May Directive as moot. We ruled that although the Secretary had "asserted substantial reasons suggesting mootness," our record was inadequate to decide the issue. A limited remand was ordered for the district court to consider the issue of mootness.

On remand, the district court held that the suit was not moot:

> Because this Court has determined that the process leading to the first moratorium lacks probity; because this Court has determined that no rational nexus exists between the fact of the tragic Deepwater Horizon blowout and placing an attainder of universal culpability on every other deepwater rig operator in the Gulf of Mexico; because this Court has determined that the first moratorium is invalid in law; and because the Interior Secretary's second moratorium arguably fashions no substantial changes from the first moratorium, the government has failed to circumvent the voluntary cessation exception to mootness.

The court also stated that the rescission of the May Directive did have "some administrative force," a statement we would interpret later that month to mean that "the preliminary injunction enjoined no longer ha[d] any operative effect." Concluding further that any opinion by our "court on the merits and legality of the issuance of the preliminary injunction would address an injunction that is legally and practically dead," we dismissed Interior's merits appeal as moot on September 29.

After the district court denied Interior's motion to dismiss for mootness, but before this court's ruling on Interior's appeal, Hornbeck filed a motion to enforce the preliminary injunction. In that motion Hornbeck argued that by rescinding and replacing the May Directive, Interior had chosen to disobey the district court's order rather than permit it to undergo an orderly process of judicial review. On September 30, the district court determined that "[i]n light of the United States Court of Appeals for the Fifth Circuit's September 29th opinion declaring moot the appeal of the preliminary injunction, the plaintiffs' motion is DENIED."

No. 11-30936

The Secretary lifted the July Directive on October 12, 2010, which was a few weeks before the moratorium's anticipated six-month expiration. This effectively mooted the Hornbeck suit. Hornbeck moved for attorneys' fees on two bases: (1) civil contempt and (2) bad-faith litigation tactics. The district court expressly declined to reach the bad-faith basis. Instead, it concluded that "the plaintiffs have established the government's civil contempt of its preliminary injunction order" by clear and convincing evidence. It would later approve an award of both fees and costs of approximately $530,000. We now consider the actions the district court identified as contemptuous and analyze whether they violated its written order.

## DISCUSSION

Inherent in the authority of the federal courts is the contempt power. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). The availability of that sanction promotes "the due and orderly administration of justice" and safeguards the court's authority. *Id.* (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)). "Because inherent powers are shielded from direct democratic controls," the Supreme Court instructs that "they must be exercised with restraint and discretion." *Id.* Rather than stemming from a "broad reservoir," they are "implied power[s,] squeezed from the need to make the court function." *Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998) (internal quotations omitted).

We review contempt findings for abuse of discretion, but "review is not perfunctory." *Id*; *see also United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1095-96 (2d Cir. 1995) (appellate review of contempt order "more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted"). Facts found by the district court will be accepted as true unless clearly erroneous, but "the interpretation of the scope of the injunctive order[] is a question of law to be determined by the independent

judgment of this Court." *Drummond Co. v. Dist. 20, United Mine Workers*, 598 F.2d 381, 385 (5th Cir. 1979).

## A.    Civil Contempt Finding

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). For civil contempt, this must be established by clear and convincing evidence. *Id.*

> Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case.

*Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir. 2004) (quotation marks and citations omitted).

The district court identified the proper burden of proof and legal standards, then laid out the reasons for its contempt finding. The court identified three categories of action that it held, when viewed "in tandem" with the national importance of the case and the reimposition of the moratorium, supported a civil contempt finding. Specifically, it found "defiance" and "determined disregard" in (1) Interior's failure to seek a remand from the district court to the agency before taking new administrative action; (2) its continuously stated public resolve to restore the moratorium; and (3) its communications to industry that a new moratorium was in the offing.

Hornbeck and Interior dispute whether our law requires a remand in this type of situation. Each side has marshaled authorities.[1] This case does not

---

[1] *Compare Broussard v. U.S. Postal Serv.*, 674 F.2d 1103, 1108 n.4 (5th Cir. 1982) (stating that "prevailing jurisprudence" holds "that once a judicial suit is filed an agency should not unilaterally reopen administrative proceedings – the agency should first ask the court to remand the case to it"); *with Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 542 (1970) (noting that "since the stay order did not forbid it from acting . . . , it was not

hinge on whose view is correct. Although a district court need not "spell out in detail the means in which its order must be effectuated," the injunction's provisions must be "clear in what conduct they [have] mandated and prohibited." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578-79 (5th Cir. 2000). The injunction did not state that Interior had to seek permission for a remand before developing additional rules on offshore drilling in the Gulf. The only mandate about returning to the court was that Interior provide a report describing "the manner and form" of its compliance with the injunction within 21 days. There has been no allegation that it failed in that duty. For Interior to have been in contempt, the injunction would have had to include an obligation to petition for a remand. *Cf. Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (vacating civil contempt against federal agencies because district court's "order did not expressly direct" cited conduct).

There were several communications to the industry manifesting Interior's "public resolve" to overcome the injunction. Six days after the injunction was entered, Interior convened a meeting in Washington, D.C., attended by Secretary Salazar and other high-ranking Interior officials. According to an affidavit from an attendee,[2] the question was posed to the government representatives "whether deepwater drilling in the Gulf could resume at that time, given the existence of an injunction against the previously issued deepwater drilling moratorium." The response by an Interior Assistant Secretary was that it was his Department's intention "to issue a second moratorium," a statement the affiant understood as "a signal that the cost and expense of resuming drilling

---

necessary for the [agency] to seek permission of the court" before ruling).

[2] Interior has not disputed the accuracy of this account, provided by James W. Noe. Noe was Senior Vice President, General Counsel, and Chief Compliance Officer of Hercules Offshore, Inc. as well as the Executive Director of the Shallow Water Drilling Coalition.

should not be undertaken by industry because the second moratorium would prevent that activity from continuing once it was issued."

The relevant public communications, acknowledged by Interior, are the Secretary's press release responding to the injunction and his testimony to Congress the next day. The press release does, as the district court recognized, evince a resolve to reissue the moratorium. That intent was made explicit before the Senate Subcommittee, just as it would be in Interior's motion for a stay in this court.

> Q. Mr Secretary, do you plan to issue a new moratorium on all exploration of oil in the Gulf of Mexico at depths of more than 500 feet?
>
> A. The answer to that is yes, Senator Alexander.

Hornbeck also directs us to an answer the Secretary provided Senator Murkowski, in which he stated:

> [W]ith respect to the moratorium, I believe it was the correct decision. I believe it's a correct decision today. And with all due respect to the honorable court, we disagree with the court. And so we are taking that decision on appeal.
> At the same time, it is important that this . . . moratorium stay in place until we can assure that deepwater drilling can be done in a safe way. We're not there today. And so we move forward with the executive authority which I have to make sure that the moratori[um] does, in fact, stay in place.

Here, as well as in responding later to Senator Feinstein, the Secretary referred to the moratorium as "in place." Hornbeck argues that terminology is a sign of defiance since an injunction prohibiting enforcement of the moratorium had issued. Interior regards the choice of words as a simple misstatement and also claims that because the May Directive had not been rescinded, the notion that the moratorium was "in place" was in some sense accurate.

Taken together, the comments to industry, to the Senate, and to the public support the district court's factual conclusion that Interior was intent on

reinstating a moratorium that imposed the same limitations as the May Directive from the moment the court enjoined it. Neither harboring that intent nor imposing a new moratorium, though, was a violation of the court order. The district court did not conclude otherwise. Hornbeck's motion for contempt focused "on the government's imposition of a second blanket moratorium hurried on the heels of the first." According to the district court, using the issuance of the July Directive as a reason for contempt would require reading its "preliminary injunction Order too broadly."

The district court explained that the injunction had been based on a finding that "the plaintiffs were substantially likely to prove that the process leading to the first moratorium was arbitrary and capricious" in violation of the Administrative Procedure Act. *See, e.g.*, *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (explaining that the Act requires "reasoned analysis" and a cogent explanation for agency action). In "answer to the plaintiffs' quarrel with the second moratorium," the court explained that Interior took the position that it had "met the Court's concerns and resolved each of the procedural deficiencies in the first." Although the court expressed skepticism about whether that would be borne out, it then ruled that under "these facts alone," it "could not, at least not clearly and convincingly, find the government in contempt of the preliminary injunction Order." We agree. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005).

Hornbeck's complaint also asserted that a six-month moratorium on all drilling exceeded the authority delegated to Interior under the Outer Continental Shelf Lands Act. The court never reached that issue. Had the May Directive been enjoined on that basis, this would be a very different case. Instead, the sole justification for the preliminary injunction that did issue was a procedural failure to explain. The court order did not explicitly prohibit a new, or even an identical, moratorium. It is true that the district court identified

additional potential APA deficiencies in the process surrounding the July Directive,[3] but those potential defects are presented here as a basis supporting the contempt. Hornbeck's "victory" was fleeting and frustrating to its goal of actually allowing drilling to proceed.

In essence, the company argues that by continuing in its pursuit of an effective moratorium, the Interior Department ignored the purpose of the district court's injunction. If the purpose were to assure the resumption of operations until further court order, it was not clearly set out in the injunction. A more broadly worded injunction that explicitly prohibited the end-run taken by Interior would have set up issues more clearly supportive of contempt.

Interior was carrying out a policy decision made by the President. On display throughout was the "decision, activity . . . and dispatch" that the Framers envisioned for the Executive Department of government. THE FEDERALIST NO. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Litigation was not able to keep pace with these developments. *See id.* (discussing the Executive's unique role "in the most critical emergencies of the state"). The national importance of this case weakens, not strengthens, the propriety of the court's contempt finding. The controversial policy decisions that the May and July Directives reflected were made at the highest level of government. In implementing those decisions, we do not discern a violation of a clear provision of the district court's order by the words expressed or actions taken by the Secretary.

---

[3] In its September 1, 2010, order refusing to dismiss the Hornbeck suit as moot, the district court raised questions regarding whether the "618 new documents and over 6000 pages" that Interior pointed to as evidence of the deliberative process that went into the second moratorium truly evidenced such deliberations. It noted that nearly every statement in the July Directive had been "anticipated by documents in the May 28 record, or by documents that were otherwise available to the Secretary before May 28." It also recognized, though, that since the Hornbeck complaint did not concern the July Directive, the issue of whether the second moratorium complied with the APA was not part of this suit.

No. 11-30936

The district court dealt expeditiously and forcefully with extremely significant litigation. The potential APA violations that led to the initial injunction are not at issue today, but such violations, if significant, would justify a district court's consideration of an injunction. Our decision is a narrow one. We conclude that there is no clear and convincing evidence that Interior's actions after the injunction violated the clear terms of the injunction as drafted. Therefore, there was no civil contempt.

*B. Bad Faith Litigation*

In the alternative, Hornbeck suggests the Equal Access to Justice Act ("EAJA") as a basis for the award of attorneys' fees. *See* 28 U.S.C. § 2412(b), (d). Interior counters that this alternative is inadequately briefed. *See* Fed. R. App. P. 28(a)(9), (b). We agree.

Hornbeck's bare-bones briefing of this issue fails to explain how the substantive and procedural requirements for an award under the Act are satisfied. First, we have held that to impose that sanction the "court must make a specific finding that the sanctioned party acted in bad faith." *Matta v. May,* 118 F.3d 410, 416 (5th Cir. 1997).[4] The court refrained from reaching the issue of bad faith and Hornbeck has offered no argument as to why that fact is not dispositive. Second, the party wishing to recover under this Act must "within thirty days of a final disposition in the adversary adjudication, submit to the agency an application which shows that the party is a prevailing party and is eligible to receive an award." *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1006 (5th Cir. 1995). In *Boland*, we declined to resolve whether a party was

---

[4] *See generally Sanchez v. Rowe*, 870 F.2d 291, 293 (5th Cir. 1989) (explaining that the EAJA authorizes attorneys' fees when the Government runs afoul of the common-law rule prohibiting parties from acting "vexatiously, wantonly, or for oppressive reasons.") (quotation and citation omitted). Further, the district court characterized Hornbeck's claim as a "common-law claim of bad faith," although its motion had invoked the statute.

entitled to attorneys' fees without evidence in the record that these procedures had been met. *Id.* Hornbeck has not alleged it complied.

Finally, without analysis, Hornbeck declares itself to be a prevailing party citing to *Dearmore v. City of Garland*, 519 F.3d 517, 521-24 (5th Cir. 2008). *Dearmore* announces a three-factor test for determining whether a plaintiff who receives a preliminary injunction is a prevailing party under a civil rights provision, 42 U.S.C. § 1988(b), when "the district court makes an unambiguous indication of probable success on the merits of his claim and the defendant subsequently moots the case before trial in direct response to the court's preliminary injunction order." *Id.* at 521, 524. Hornbeck has not engaged with any of those considerations. Importantly, it has not explained how it can escape from its decision to stipulate to dismiss the case or from the district court's conclusion that the July Directive did not moot the case because the voluntary-cessation exception applied. *E.g.*, *Pederson v. La. State Univ.*, 213 F.3d 858, 873 (5th Cir. 2000).

This potential basis for maintaining the award is waived because it has not been meaningfully briefed. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 531 n.2 (5th Cir. 2012) (citing Fed. R. App. P. 28).

The finding of contempt and the award of fees and costs are REVERSED.

No. 11-30936

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

Because I would hold that the district court did not abuse its discretion in holding Interior in contempt, I respectfully dissent. While the majority views Interior's acts in isolation, the totality of the circumstances supports the able district court's decision.

I.

The Gulf of Mexico is one of the largest oil and gas basins in the world. Its wells accounted for almost one-third of the nation's domestic oil production in 2009. The Gulf's Outer Continental Shelf ("OCS") has thousands of active leases, most in the deepwater, and is a vital national resource that Congress has determined "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 § U.S.C. 1332(3).

Deepwater drilling, exploration, and production operations in the Gulf of Mexico keep thousands of Americans at work. An intricate network of companies cooperate to provide the technology, assets, and human capital necessary to keep the industry in motion. *Cf.* Interior's Safety Report at 4 ("The OCS oil and gas industry provides relatively high-paying jobs in drilling and production activities, as well as employment in supporting industries. Offshore operations provide direct employment estimated at 150,000 jobs."). Take, for example, Hornbeck. It contracts with oil and gas production companies to provide supply vessels that are specifically designed to assist in the deepwater drilling process. In 2010, it employed about 1300 people and maintained a working relationship with almost 2000 other vendors and service providers. Hornbeck is but one of thousands of companies whose viability depends on deepwater drilling in the Gulf.

No. 11-30936

The Deepwater Horizon tragedy rocked not only the business of deepwater drilling in the Gulf, but also the region's entire economic and ecological system. Its devastating consequences reverberated across the nation. In its wake, the President ordered Secretary Salazar to investigate the Deepwater Horizon incident and recommend, if necessary, additional safety requirements for OCS exploration and production efforts. Secretary Salazar halted consideration of all new applications for drilling permits in the Gulf while he complied with the President's order.

During the course of Interior's investigation, the Mineral Management Service (now known as the Bureau of Ocean Energy Management) inspected twenty-nine of the thirty-three permitted wells that were being drilled in the Gulf's deepwater. Of the twenty-nine inspected wells, twenty-seven were fully compliant with all regulations. Only two had minor violations, which were quickly corrected.

Interior's research culminated in the Safety Report, issued on May 27, 2010, about five weeks after the Deepwater Horizon explosion. The body of the Safety Report included numerous proposals to improve OCS drilling safety, such as equipment enhancements, testing requirements, and certification procedures. The report's executive summary, however, included an additional recommendation: a six-month halt to all drilling in the Gulf of Mexico. Although the Safety Report stated that all of its recommendations were peer-reviewed by seven experts identified by the National Academy of Engineering, five of those experts, plus three consulting experts, later stated that the report misrepresented their position. According to these experts, the moratorium recommendation "was added after the final review," and, therefore, not a part of their analysis. An investigation by the Interior's Office of Inspector General later revealed that a White House edit "led to the implication that the

16

moratorium recommendation had been peer-reviewed by the experts." One day after it published the Safety Report, Interior issued a memorandum effectuating the six-month moratorium (the "May Moratorium").

Hornbeck, along with numerous other companies in the deepwater drilling industry, quickly filed suit to enjoin Interior from enforcing the May Moratorium. Among other things, they argued that the May Moratorium violated the APA because it was arbitrary and capricious. The district court held a hearing on Plaintiffs' motion, at which it rigorously questioned counsel for both parties for over two hours. According to the district court, the government responded to one of its questions with an answer that was "wholly at odds with the story of the misleading text change by a White House official, a story the government does not now dispute." One day after the hearing, the district court granted Plaintiffs' motion, carefully detailing the basis for its decision in a twenty-two page opinion. The district court then entered an order that "immediately prohibited" Interior from enforcing the moratorium "as applied to all drilling on the OCS in water at depths greater than 500 feet." The order further specified that Interior was to file, within twenty-one days, a report "setting forth in detail the manner and form in which [Interior] ha[d] complied with the terms of [the] Preliminary Injunction."

Immediately following the court's entry of the preliminary injunction, Interior took steps to ensure that the intended effect of the May Moratorium—that no one drill in the Gulf—remained intact. For example:

- Within hours, Secretary Salazar publicly announced that the May Moratorium "was and is the right decision" and promised to "issue a new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."[1]

---

[1] The Secretary's comments came on the heels of the district court's holding that the May Moratorium was so lacking in scientific support that it was likely arbitrary and capricious. The short time that elapsed between entry of the district court's order and these

17

- The next day, Secretary Salazar attended a Senate subcommittee hearing, where he again declared that he would issue an identical moratorium in short order.

- At the Senate hearing, Secretary Salazar twice referred to the moratorium as "in place." First, after noting his disagreement with the district court's order, Secretary Salazar stressed, "it is important that this . . . moratorium *stay in place* until we can assure that deepwater drilling can be done in a safe way." Then, he responded to a question concerning the May Moratorium's effect on drilling in Alaska specifically stating: "You know, the moratorium *that is in place* does, in fact, apply to Alaska wells and to the exploration of wells that Shell had proposed to put into place."

- Interior then hosted a meeting with numerous oil and gas representatives. Although it acknowledged the injunction, it again emphasized that it intended to issue a second moratorium. An industry participant averred that this signaled "that the cost and expense of resuming drilling should not be undertaken by [the] industry because the second moratorium would prevent that activity from continuing once it was issued."

- Interior appealed the district court's order and moved to stay the injunction pending appeal. In its motion, Interior proclaimed that "reducing deepwater drilling risks is a national priority; the Secretary will pursue all avenues for addressing risky operations, and will take new and immediately effective action as necessary."[2]

- Further, Interior decided to notify thousands fewer entities of the preliminary injunction order than it had of the May Moratorium. When it issued the May Moratorium, Interior sent written notice to all 4500 active leases in the Gulf's deepwater. By contrast, its notice regarding the preliminary injunction went to only the thirty-

---

comments is, therefore, an important part of the overall contempt equation. Regardless of whether Interior had *authority* to issue a new moratorium, the district court recognized that the *immediacy* of the Secretary's public statements showed a "determination to issue a new moratorium even before the consideration of any new information."

[2] This court denied Interior's motion to stay, but ordered expedited briefing on its appeal.

three wells that were being drilled at the time of the Deepwater Horizon incident.

Ultimately, these actions had the same effect as the May Moratorium: no one resumed drilling.

As promised, Interior issued a new moratorium (the "July Moratorium") in place of the May Moratorium. As the majority recognizes, the July Moratorium was "without doubt" the same in "scope and substance" as the May Moratorium. They were mirror images of one another, covering the same rigs and the same deepwater drilling for the same period. Indeed, as the district court explained, "nearly every statement in the July 12 decision memorandum is anticipated by documents in the [May Safety Report] record, or by documents that were otherwise available to the Secretary" at the time he issued the May Moratorium. Interior issued the July Moratorium without seeking remand to reopen its administrative proceedings, despite the fact that its expedited appeal of the district court's preliminary injunction order on the May Moratorium was pending before this court.

In motions before both the district court and this court, Interior sought to avoid a final decision on the merits regarding whether the May Moratorium was arbitrary and capricious. It argued that its rescission of the May Moratorium rendered the issue moot. After a series of proceedings, including a remand to the district court, we declined to address an injunction that was "legally and practically dead," and denied Interior's merits appeal as moot. In light of that decision, the district court declined to further enforce the preliminary injunction. Interior lifted the July Moratorium on October 12, 2010, allowing drilling operations to resume and essentially mooting Plaintiffs' suit.

Plaintiffs moved for civil contempt in the district court, seeking their attorneys' fees in the suit. They argued that Interior's actions following the

No. 11-30936

entry of the court's preliminary injunction reflected a "calculated plan to interfere with enforcement of a remedy obtained by Plaintiffs and to insulate the moratorium decision from judicial review." By this time, the district court had reviewed thousands of pages, held numerous hearings, thoughtfully considered and decided multiple motions, and confronted the very issues in play in the contempt order. In short, the district court knew this case inside and out. Viewing the totality of the circumstances, the district court concluded that Interior's actions amounted to a "determined disregard" of the preliminary injunction order and found Interior in contempt.

## II.

"Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees."[3] *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303-304

---

[3] On appeal, this Court reviews a district court's finding of contempt for abuse of discretion. *Whitcraft v. Brown,* 570 F.3d 268, 271 (5th Cir. 2009) (citing *United States v. City of Jackson*, 359 F.3d 727, 731 (5th Cir. 2004)). Relying on the Second Circuit's opinion in *United States v. Local 1804-1*, the majority opinion suggests that a "more rigorous" abuse-of-discretion standard applies to the district court's civil contempt finding and award of compensatory sanctions. 44 F.3d 1091, 1095–96 (2d Cir. 1995) (stating the proposition that appellate review of a contempt order is "more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted."). If the majority opinion simply means that a district court's discretion is subject to certain limitations—such as the clear and convincing evidentiary standard—in the civil contempt context, then I agree. *See*, *e.g.*, *Spallone v. United States*, 493 U.S. 265 (1990) (noting that the use of the contempt power "places an additional limitation on a district court's discretion" because "in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed'" (internal quotation and citation omitted)); *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (noting that a court must find contempt by clear and convincing evidence). If, however, the majority has applied a heightened standard of review on appeal (essentially abuse-of-discretion-plus), then I am aware of no support in our precedent for that approach. To the contrary, we have consistently applied an ordinary abuse-of-discretion standard in the civil contempt context. *See, e.g.*, *Whitcraft*, 570 F.3d at 271; *Jackson*, 359 F.3d at 731; *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). As such, we are not at liberty to deviate from the ordinary abuse-of-discretion standard.

20

No. 11-30936

(1947)); *see Spallone v. United States*, 493 U.S. 265, 276 (1990) (expressing "the axiom that courts have inherent power to enforce compliance with their lawful orders through civil contempt" (internal quotation marks omitted)); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (recognizing district courts' inherent authority to impose sanctions) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 32 (1991)). "The theory for allowing attorneys' fees for civil contempt is that civil contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Cook*, 559 F.2d at 272. A district court's contempt power extends to the actions of government officials with equal force. *See Gilbert v. Johnson*, 490 F.2d 827, 831 n.6 (5th Cir. 1974) (affirming the district court's "right to apply the sanctions of contempt even though Government officials are involved").

A court may exercise its contempt power over actions that constitute "disobedience to the orders of the Judiciary." *Chambers,* 501 U.S. at 44. While the relevant order must be specific and definite, the district court "need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines*, 228 F.3d at 578 (citing *N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 917 (5th Cir. 1996)). In other words, an order simply must be "framed so that those enjoined will know what conduct the court has prohibited." *Id.* (quoting *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981)).

In analyzing a district court's contempt finding, it is essential to view the facts in their totality. This court should remain cognizant that the imposition or denial of sanctions is necessarily "fact-intensive." *Test Masters Educ. Servs. Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (quoting *Thomas v. Capital Sec.*

21

*Serv., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988)).  Factual findings are subject to the deferential "clear error" standard on appeal.  *Whitcraft*, 570 F.3d at 271; *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) (noting that clear error does not exist if a factual finding is "plausible in light of the record *viewed in its entirety*," even if we would have weighed the evidence differently (emphasis added)).  The district court judge, not this court, is in the "best position to review the factual circumstances and render an informed judgment as he is intimately involved with the case, the litigants, an the attorneys on a daily basis."  *Test Masters*, 428 F.3d at 582.  A "second-hand" review of the facts adds "no advantage," as the "district court will have a better grasp of what is acceptable trial-level practice among litigating members of the bar."  *Id.*

The majority opinion weakens the contempt power of federal district courts by making unreasonably restrictive fact findings of its own to reach a narrow and unworkably technical result.  It stresses that the preliminary injunction order did not *expressly* prohibit Interior from harboring an intent to reinstate an identical moratorium, or from stating that intent in the public forum.  Likewise, the preliminary injunction order did not *expressly* require Interior "to seek permission for a remand before developing additional rules on offshore drilling in the Gulf."  In essence, the majority opinion suggests that a litigant can undermine and avoid a district court's order, provided that it does not, as a very technical matter, engage in activity that the order expressly prohibits.

This court's precedent is not so cramped, however.  A district court order need not anticipate every creative or strategic tactic a litigant may take to evade it.  *See N. Alamo*, 90 F.3d at 917 ("Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies

the end results expected and allows the parties the flexibility to accomplish those results."); *see also Am. Airlines*, 228 F.3d at 576.   *American Airlines* is instructive on this point.   There, the district court issued a temporary restraining order mandating that union officials call off a "sick-out" by the union's pilot members.  *Id.* While the union officials engaged in a number of technical steps to comply with the court order, their initial communication was "so lacking in authoritative forcefulness that [it] either [was] not heard at all . . . or [was] discounted as being merely stage lines parroted for the benefit of some later judicial review."  *Id.* at 921 (quoting *United States Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363 (5th Cir. 1979)).   The district court held certain union defendants in contempt based on this "wink-and-a-nod" approach.  *Id.* at 928-29.  We affirmed.  *Am. Airlines*, 228 F.3d at 576.  Other cases decided by courts in this circuit illustrate the same general approach.  *See S.E.C. v. Reynolds*, No. 3:08-CV-438-B, 2011 WL 903395, at *1 (N.D. Tex. Mar. 16, 2011) (holding a defendant in contempt for violating the terms of an asset freeze order after he failed to pay taxes and assessments on a condominium, even though the order did not expressly require the defendant to pay taxes or assessments); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 565  (E.D. La. 2009) (concluding that a Parish Council's moratorium on the construction of multi-family housing violated the terms of a consent order, even though that order did not explicitly prohibit the Council from imposing the moratorium).

Here, the purpose of the district court's order was clear: Interior could not enforce the May Moratorium on drilling.  By, among other things, referring to the May Moratorium as "in place" without simultaneously indicating that drilling could proceed pursuant to the court's injunction, emphasizing its

No. 11-30936

immediate intent to issue a new, identical moratorium, and notifying only the thirty-three wells that were being drilled at the time of the Deepwater Horizon incident, Interior ensured that the May Moratorium remained *de facto* in place. Considering these circumstances as a whole, the district court concluded that "each step the government took following the Court's imposition of a preliminary injunction showcase[d] its defiance" of the court's order.

Viewing the facts and the district court's preliminary injunction in their totality, I cannot say that the district court abused its discretion in finding Interior in contempt. For that reason, I would affirm.

III.

In reaching its conclusion, the majority opinion stresses that this was a case of national importance—a fact that, in the majority opinion's view, "weakens, not strengthens the propriety of [a] court's contempt finding." I find this troubling.

Our Founding Fathers stressed the necessity of protecting the independence of the Judiciary, especially in light of its unique vulnerability to attack by the other branches of government. *See* The Federalist No. 78 at 227 (Alexander Hamilton) (Roy P. Fairfield ed., 1961) ("[T]he judiciary is the weakest of the three departments of power . . . all possible care is requisite to enable [the Judiciary] to defend itself."); *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) ("The Federal Judiciary was . . . designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure.").

The Judiciary's inherent contempt power is essential to preserve judicial independence and to ensure that judicial decrees are not impotent. In

24

No. 11-30936

describing its nature and importance, the Supreme Court has stressed that "[t]he power to punish for contempt . . . is essential to . . . the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice." *Ex parte Robinson*, 86 U.S. 505, 510 (1873); *see Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("[T]he [contempt] power has been uniformly held to be necessary . . . to enable [the Judiciary] to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of citizens."); *see also In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (quoting *Gompers*, 221 U.S. at 450). Leaving the Judiciary powerless to enforce its own orders incontestably renders it a subordinate branch of government.

As the majority opinion states, the "controversial policy decisions" at issue here were "made at the highest levels of government." But that does not insulate those decisions from judicial review. The district court determined that the Interior's actions amounted to a "determined disregard" of its preliminary injunction order. The court's power to enforce its orders must remain intact, even in the midst of the most critical emergencies of the state. Simply put, the Judiciary may be the least dangerous branch, but it is not entirely toothless.

For these reasons, I respectfully dissent.